## RYAN v. UNITED STATES et al.
### No. 63 of 1942.

District Court, E. D. Pennsylvania.

Nov. 10, 1944.

Philip Dorfman, of Dorfman & Levitan, all of Philadelphia, Pa., for libellant.

Krusen, Evans & Shaw, of Philadelphia, Pa., for respondents.

KALODNER, District Judge.

This is a libel in personam brought against Lyke Bros. Steamship Co., Inc., incorrectly designated in the libel as Lykes Brothers Steamship Co. The libel also designated as defendants the United States of America and the United States Maritime Commission, but the Libellant consents to dismissal of these defendants on the basis of the decision of this court by Judge Kirkpatrick in Burkholder v. United States of America, D.C. 1944, 56 F.Supp. 106.

The theory of the action is negligence, and the narrow question for determination is whether the Libellant sustained his injuries as a result of the failure of the Master of the steamship on which Libellant was employed, to have the lifeboats fixed in the position prescribed by the Coast Guard Regulations.

The case was submitted to the court on the pleadings, additional testimony and argument of counsel. Accordingly, I make the following

### Findings of Fact

1. At all times herein the Steamship "Syros" was owned, operated and controlled by Lykes Bros. Steamship Co., Inc., and the Libellant was an employee of Lykes Bros. Steamship Co., Inc.

2. At all times material hereto the Steamship "Syros" was under time charter to the United States of America, but the Respondent Lykes Bros. Steamship Co., Inc., operated and controlled the vessel and employed the officers and crew.

3. In March, 1942, prior to sailing from the United States there were installed upon the Steamship "Syros" sliding lifeboat chocks to facilitate launching of the lifeboats. These chocks were designed and installed by Maryland Dry Dock Company.

4. On the 16th day of April, 1942, the United States Coast Guard issued its Regulation:

"153.3 Lifeboats on Ocean and Coastwise Vessels

"(b) Readiness for Lowering. Masters shall with due regard to safety, cause all lifeboats attached to davits other than gravity davits to be properly griped in the outboard position as will allow immediate lowering in case of emergency. All boat covers are to be removed when the vessel is at sea and the guys rigged from the davit heads. All falls gear and equipment are to be ready for immediate use." Dated

April 16, 1942. In Federal Register April 18, 1942, Vol. 7, No. 76, Page 2908.

5. On May 26, 1942, the Steamship "Syros" was one of a convoy of vessels sailing through the Barents Sea bound for Murmansk, U.S.S.R.

6. The Steamship "Syros" was sunk as a result of enemy action when torpedoed in the Barents Sea while bound for Murmansk, U.S.S.R., on May 26, 1942, at about 1:00 A.M. The vessel sank within two minutes or so after being torpedoed.

7. About 1:00 A.M. on May 26, 1942, the Libellant was in the messroom on the Steamship "Syros" when the alarm bell sounded. He went to the galley and then through a passageway proceeding toward one of the upper decks. While he was thus proceeding a torpedo struck the ship. When the Libellant attempted to ascend to the boat deck, which was two decks above the messroom where he had been at the time of the sounding of the alarm bell, he was stopped by the Boatswain and ordered to release one of the life rafts since there was not time to launch a lifeboat.

8. The Libellant proceeded toward the stern on the port side but found that the life raft there had already been launched. He thereupon proceeded toward the starboard side of the vessel, his progress being impeded by the deck cargo which had been loosened and shifted by the explosion of the torpedo and a second explosion, either of the ammunition cargo of the ship or a second torpedo. Libellant then tried to reach the poop deck; while he was thus proceeding the vessel sank and carried him below the surface of the sea; when he rose to the surface he noticed that two phalanges of the second finger of his left hand were missing.

9. The Libellant was rescued by another vessel and taken to Murmansk, where his finger was treated. Thereafter he was repatriated, and while en route, he was again hospitalized in Iceland. On returning to the United States he was treated by the United States Health Service and discharged "to duty" on September 5, 1942.

10. The sliding lifeboat chocks on the Steamship "Syros" were in the outboard position and the davits were turned outward.

11. The second cause of action for maintenance and cure has been settled, discontinued and ended.

12. The third cause of action, claiming the benefits of the Policy of War Risk Insurance, has been settled, discontinued and ended.

Discussion

The Libellant contends that the proximate cause of his injury was the failure to have the lifeboats fixed in the position prescribed by the Coast Guard Regulations as set forth in Finding No. 2. The Libellant, the only witness who could testify concerning the injury, was unable to explain in what way, or when, he sustained the injury, but could only say that after the Steamship "Syros" sank, and while he was still in the water, he noticed that part of his finger was missing. Of course, this is not unusual in view of the event and the attending excitement. The Libellant asserts that had the lifeboats been fixed for emergency use, he would not have been delayed on the sinking vessel and thereby exposed to additional dangers. However, the Libellant's own testimony reveals that from the time he met the Boatswain until the time he was washed overboard, about forty seconds elapsed: it took him ten seconds to travel from the point where he spoke to the Boatswain to the port life raft, and thirty seconds from the port life raft to the flying bridge where he was washed overboard. He had only a glimpse of the lifeboats from the top of the second ladder leading to the boat deck where he met the Boatswain, for, according to his testimony, only about one minute and ten seconds elapsed between the time he left the mess room, two decks below the boat deck, to the time he was washed overboard; he stated that at that time the lifeboat davits were in an upright position.

Granting that Ryan had time to launch a lifeboat, the fact is he did not go near or attempt to launch a lifeboat, but properly followed the orders of the Boatswain, who, being of the opinion there was no time to release a lifeboat, directed him to go to the port life raft. Whether the Boatswain was of such opinion because of the rapidity with which the ship was sinking, or because of the position of the lifeboats, I cannot say on the evidence offered. Obviously, if the former were true, any failure to properly maintain the lifeboats could not have been the proximate cause of Libellant's injuries. It is contended, however, that the reason for the order was that the lifeboats were not in the "emergency" position.

While the Libellant identified the lifeboat davits as being of the quadrantal type, the evidence is conclusive that at Baltimore, Maryland, the Steamship "Syros" was equipped with sliding chocks, different from the ordinary "U" type, and a simple device for releasing the lifeboat from the chocks so that it would automatically swing out when the chocks and davits were in the outboard position.

The Coast Guard Regulation which Libellant claims was negligently violated, required that the lifeboats be "properly griped in the outboard position so as to provide for immediate lowering." Mr. Davidson, the Second Mate, testified (by deposition) that the lifeboats were kept in accordance with the requirements of the Regulations; the testimony (also by deposition) of Mr. Nielson, the Third Mate, is in support. Furthermore, the credible testimony of Mr. Davidson was that at the time of the second torpedo or explosion, about two minutes after the first torpedo struck, he ran to the No. 1 starboard lifeboat; that the davits were in the outboard position, as were also the chocks; that he released the lifeboat by kicking loose the pelican hook and pushing down the releasing rod; that the boat swung out, but it was not necessary to lower it since the water had reached knee level; and that from the time the first torpedo struck, to the time he released the lifeboat about three minutes had elapsed.

Considering all the evidence, I am of the opinion that, at the time of the emergency, which is the time of importance here, the lifeboats were in the outboard position, in conformity with the requirements of the Coast Guard Regulation.

Accordingly, I state the following

Conclusions of Law

1. The United States of America, as time-charterer, is not responsible on the first cause of action set forth in the Libel and the action against the United States of America should be dismissed.

2. The installation of the sliding chocks on the Steamship "Syros" and the maintenance of the lifeboats in the outboard position on the said chocks with the davits turned outward complied with the Regulations of the United States Coast Guard in effect on May 26, 1942.

3. The injury suffered by the Libellant herein was the result of, and proximately caused by, enemy action.

4. There was no negligence or other failure of duty with respect to maintenance of the lifeboats on the Steamship "Syros," on the part of Lykes Bros. Steamship Co., Inc., toward the Libellant.

5. The cause of action against Lykes Bros. Steamship Co., Inc., should be dismissed.

An order may be submitted in accordance with this opinion.